# LEVIN IRVING MURRELL

*vs.*

## L. GORDY CULVER.

*Criminal Conversation—Plaintiff's Connivance—Instructions—Bill of Exceptions.*

In an action for criminal conversation with plaintiff's wife, testimony by defendant's wife as to the hardships which she endured in connection with the purchase and working of their farm and the raising of their children, was prejudicial error, the only possible purpose of such testimony being to affect the assessment of damages in case of the plaintiff's recovery, and the appeal being based on the inadequacy of the judgment in his favor.                                        pp. 351, 352

Where a number of questions to a witness, and her answers thereto, related to the same thing, *held* that the fact that they were all embodied in one bill of exceptions was not ground for declining to consider such bill of exceptions.          p. 350

That it is permissible, in an action for criminal conversation, to prove the standing and financial condition of the parties, does not authorize the wife of the party being sued to show what part she took in acquiring or paying for the property occupied by her and her husband.                      p. 353

In an action for criminal conversation, there being no evidence of immorality or misbehavior on the part of plaintiff's wife except in connection with defendant, it was error to grant a prayer that the jury should consider in mitigation of damages the facts, in case they believed that the evidence established them, that she and defendant were equally guilty, and that her fall was due to her own licentiousness.     pp. 353-356

In order to justify a recovery, in an action for criminal conversation with plaintiff's wife and for alienation of her affections, it is not necessary that the alienation of affections should be permanent.                                       p. 356

In an action for criminal conversation with plaintiff's wife, if the conduct of the husband, as established by undisputed evidence, or admitted, was such that a rational mind can draw no other conclusion than that he did not consent to his wife's misconduct, it is proper for the court so to instruct the jury.  p. 358

In an action for criminal conversation with plaintiff's wife, and for alienation of her affections thereby, *held* that the evidence as to plaintiff's consent to, or connivance at, his wife's misconduct was sufficient to go to the jury.    p. 360

*Decided June 22nd, 1922.*

Appeal from the Circuit Court for Worcester County (BAILEY and DUER, JJ.).

Action by Levin Irving Murrell against L. Gordy Culver. From a judgment for plaintiff for one hundred dollars, he appeals.  ·Reversed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*F. Leonard Wailes,* with whom were *L. Atwood Bennett, Miles & Myers, Staton & Whaley,* and *Ellegood, Freeny & Wailes* on the brief, for the appellant.

*A. W. W. Woodcock* and *F. W. C. Webb,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellant recovered a judgment for one hundred dollars against the appellee, and, not being satisfied with the amount, took an appeal. There are three counts in the declaration. The first alleges that the defendant debauched and carnally knew the plaintiff's wife; the second, that the defendant debauched and carnally knew the plaintiff's wife, and thereby the affection of his wife for him has been alienated and destroyed and he has wholly lost and been deprived of her society and assistance; and the third alleges that the

defendant had alienated the affections of his wife and wrongfully and maliciously induced her to leave and abandon his home. There are three bills of exception in the record, the first and second presenting rulings on the admissibility of evidence and the third embracing those on the prayers. The trial court granted the third, fourth, fifth, seventh, twelfth, thirteenth and fifteenth prayers offered by the defendant and the plaintiff objected generally and filed special exceptions to each of them.

Mrs. Culver, the wife of the defendant, was called by the defendant. She had testified without objection that they lived on a farm, and in reply to a question, who owned it, said, "Gordy and myself. We worked it from the time we were married up to the present date. I am the mother of four children during that time, and I have worked hard morning and night, and at times with one in my arms." By "Gordy" she meant her husband. She also said that they had been married nineteen years the following Saturday, and her husband had bargained to buy the farm about six months before they were married, and Mr. Miller held a mortgage on it. The plaintiff objected to each of nine questions asked her, and the first bill of exceptions presented the rulings of the trial court overruling those objections. Those questions elicited answers to the effect that her husband paid, when he bought the farm, "just enough to hold the mortgage," the amount of which she did not remember; that the mortgage had been paid by "his and my hardship," that she contributed to pay the mortgage by work on the farm; that she had "worked from the hoe to the binder"; that she was working when her children were being raised and worked to the present time. On being asked, "How were you able to work on the farm and raise your children at the same time?" she said, "There were about twenty months in the first two and twenty-four months difference in the last two, and I put a box on the machinery and carried the one with me I was working with."

There could have been but one object in going into such detail about the mortgage and the wife's work on the farm— to affect the jury in assessing the damages, if the plaintiff recovered. The wife testified that she and her husband were still living on the farm. The title of record to it is not shown. Although she said, in answer to the question, who owned the farm, "Gordy and myself," she later stated what we referred to above, and said, when asked how much he paid on it, that she could not tell exactly the amount. So whether the record title was in the two, and if so, whether they were tenants in common, or tenants by the entireties, does not appear. Nor can we be certain whether she simply meant that they owned it together, by reason of the work that she did on it. But we can have no doubt that it was error to admit such testimony, and we cannot hold that the error was not injurious and therefore not reversible.

The evidence of Mrs. Culver, where she spoke of her working on the farm in the first part of her testimony, might well have been objected to, but the part which was objected to went beyond that and was not harmless, by reason of what had already been said without objection. We also considered the effect of including so many questions and answers in one bill of exceptions, and, while it is not to be encouraged, and under some circumstances we have strongly expressed our disapproval of the practice, all these questions and answers related to the same thing. The twelfth, thirteenth and fourteenth of themselves would not have been material, but showing that the mortgage had been paid off, "by his and my hardship," and then going into detail as to that hardship and the character of her work, were injurious and did constitute reversible error. So, following what we did in *Frick* v. *State*, 128 Md. 122, where many of our decisions on this subject are referred to, we have not felt that we should decline to consider this first exception, especially as the consideration of either of the questions in it would result in the same conclusion we have reached on all of them. In addition to

that, the ruling in the second bill of exceptions, which was clearly erroneous, was based on the testimony in the first. That witness testified that he lived about a mile from Mr. and Mrs. Culver, that he had heard her testimony and heard her say that she had worked hard on that farm, and was permitted to answer the question, "Is that true?" And he answered, "Yes." Upon what theory that testimony was allowed is not shown. The suggestion of the appellee, that it is always admissible in such cases to prove the standing and financial condition of the parties, certainly does not authorize the wife of a party being sued, to show what part she took in acquiring or paying for the property. There is not even any impeachment of her evidence on that subject (although we do not mean to say it would have been competent, if there had been), and, while ordinarily, such a question and answer might be harmless, it was very objectionable in this case for the reasons that we have already given in connection with our consideration of the first bill of exceptions, and there was reversible error. It was well said, in *Ickes* v. *Ickes,* 237 Pa. 582, that "in a case of this kind, where human sentiment is apt to play a leading part, the trial judge should be most cautious not to admit evidence which might have a tendency to bias the jury against either side, unless clearly relevant and competent."

The defendant's fifth, twelfth and fifteenth prayers are most important, but we will first consider the others which were granted. His fourth instruction to the jury, that they should consider in mitigation of damages (provided they believed that the evidence established them) the following facts: that the plaintiff's wife and the defendant were equally guilty, and that the plaintiff's wife's fall was due to her own licentiousness, was specially excepted to on the ground that there was no such evidence. In 13 *R. C. L.* 1489, par. 539, it is said: "It is immaterial, according to the better view, the question of damages not being involved, that the defendant was led into the adulterous intercourse through the acts and

practices of the plaintiff's wife, instead of being himself the seducer." But on page 1495, paragraph 546 of that volume, the author states that: "Where a husband sues for the seduction of his wife, it is well recognized that the fact that she was not seduced, as the term is ordinarily understood, but that she herself was the enticer, or seductress, that is, that her fall was due to her own licentiousness and not the result of the blandishments and enticements of the defendant, is a most material fact for consideration in estimating the damages to be awarded the husband. Such a rule is the natural dictate of common sense, since most certainly the husband cannot be deemed to have been injured in law to the same extent as if his wife had been otherwise a virtuous woman."

We have no criticism of that statement of the law as there announced, but it should be very carefully applied in any case. There is not any evidence whatever, worthy of consideration, of the plaintiff's wife being immoral, or misbehaving herself, excepting with the defendant. The defendant's statements, made in the presence of his brothers, his own son, Mr. Schwartz, the brother of the plaintiff's wife, and the plaintiff and his wife on September 15, 1920, when they met to inquire into the truth of what the defendant's brothers had told the plaintiff the day before, would seem to be strong, if not conclusive evidence, that the defendant was really the most guilty party of the two. When confronted by the charges he said, in the presence of his wife, his son and others: "I love her better than any woman on earth," and made other statements of a like character. The plaintiff took some money out of his pocket, laid it on the seat of the carriage in which they were sitting and said: "Lena, if this is so, go somewheres out of my sight, but if it is not so, you be home when I come home from my work tonight." He got out of the carriage and went towards the farm on which he was building a house in which he and his wife were to live, but not where he was then living. Her brother left the other persons and followed the plaintiff, but soon came back and found the defend-

ant, his wife and son and his sister, Mrs. Murrell. He asked them, addressing his sister and the defendant, what they were going to do, and said to his sister: "He (plaintiff) wants you to get out of his sight if these things are true." The defendant said: "We are not going to tell you what we are going to do until we have a private talk with each other." He made that assertion several times, and Mrs. Culver, her son and Mr. Schwartz went to the house, leaving the defendant and plaintiff's wife by themselves in the road. The defendant called him (Schwartz), and he went to them and again asked them what they were going to do, saying to his sister, "Lena, you go home with me and perhaps we can reconcile this matter and forget the past and try to start a new life over again." The defendant said: "No, I love her better than any woman on earth and I expect to stick to her to the last." Schwartz's sister would not answer at first, but he tried to persuade her to go home with him and finally she said she wanted to go to her sister in New York, and the defendant said he was going south. Later he said again to his sister, "Lena, will you go back to Irving, if he will take you back?" She shook her head, "Don't know." He told her that was no answer, and he asked the defendant if he would go back to his wife, and he said, "No, my God, I love her better than any woman on earth and I expect to stick to her to the last." It resulted in Mr. Schwartz taking his sister to his home, after going by the plaintiff's house to get some clothes, and after dinner he took her to the train, bought her a ticket to New York, and she left, apparently for that city.

On the 21st of that month, the defendant called on a lady who rented rooms in Atlanta, Georgia, and rented two rooms for himself and his wife, telling the landlady that his wife was detained in New York. In about ten days plaintiff's wife joined the defendant there and they lived together in two rooms, representing themselves to be man and wife, by the name of Collins, until November, when the defendant left her

there, after paying rent for the room for a week longer. She left there, but it was not shown where she is. The defendant is living with his wife again, but neither he nor the plaintiff's wife appeared at the trial.

We have thus at some length related what occurred on September 15th at the Culver house, and then later in Atlanta, as they are important facts. While, as is generally so in such cases, both of them are guilty of outrageous misconduct, there is no evidence of such special conduct on her part as justified the granting of the fourth prayer, especially that part which referred to the fall of the plaintiff's wife being due to her own licentiousness. There was, therefore, error in granting that prayer, which was likely to have and doubtless did have a very material effect on the amount of damages allowed.

The fifth prayer would not have been objectionable if it had concluded simply against the recovery under the third count, but the way it is framed might be misleading, as the jury might not have understood that it referred alone to the third count; but as the plaintiff obtained a verdict, we do not see that any injury was done the plaintiff in that ruling. The seventh was erroneous as, without referring to other things, it was not necessary for the defendant to *permanently* alienate the affections of the plaintiff's wife in order to entitle the plaintiff to damages. It may be very rare, but it is possible for a woman to be led off by some temporary affection for another man or some attraction he has for her, and then see the error of her ways and be forgiven by her husband. This plaintiff was apparently very devoted to his wife and seemed to be ready to forgive and forget very easily.

The thirteenth prayer states correctly the law on the subject when applicable to the facts, but we do not find any evidence to sustain it.

This brings us to the third, twelfth and fifteenth prayers, which can be considered together. By the third, the jury was instructed that "if they believed from the evidence that the

plaintiff consented or connived at the alleged debauching or carnal knowledge of the plaintiff's wife by the defendant, then their verdict must be for the defendant on the first and second counts." By the twelfth, the jury was instructed that if they believed from the evidence that the plaintiff consented or connived at the alleged carnal knowledge and alienation of the plaintiff's wife then their verdict must be for the defendant. By the fifteenth the jury was instructed that if they believed from the evidence "that the plaintiff's conduct was such that a rational mind could draw no other conclusion therefrom than that he had consented, actively or passively, to the conduct on the part of his wife and the defendant, of which he complains, then their verdict must be for the defendant under the first and second counts of the declaration.

The plaintiff filed special exceptions to each of those prayers. The jury could not have believed that the plaintiff consented or connived at the alleged carnal knowledge and alienation of the plaintiff's wife, and have brought in a verdict for the plaintiff, without violating the instructions given in the twelfth prayer, as they were by it instructed that if they so believed, their verdict must be for the defendant. Under the authorities, connivance on the part of a husband is a bar to an action for criminal conversation. It was said in *Kohlhoss* v. *Mobley,* 102 Md. 199, 206: "The authorities are in substantial accord as to the character and degree of connivance requisite to bar an action of *crim. con.* The conduct of the husband must be such, when subjected to the test of reasonable human transactions, as to show an intention to connive; and here, as elsewhere, the presumption of the law is in favor of honesty and correctness of purpose, but the husband, like other persons, is chargeable with an intention to produce the necessary and legitimate consequences of his own deliberate action. A passive connivance has been held to be as effectual as an active one to bar the action." In this case there can be no doubt about the adulterous relations between the defendant and the plaintiff's wife in

Atlanta, Georgia. That is shown by what we have stated above, but it cannot be contended under the evidence that the plaintiff consented or connived at such relations, or the alienation of his wife's affections after September 15, 1920, when the plaintiff and his wife separated, she going to New York and the defendant going to Atlanta, where she joined him, unless it can be said, as it was in *Kohlhoss* v. *Mobley,* that the course previously pursued by the plaintiff showed an indifference to and acquiescence in the conduct and attitude of his wife and defendant toward each other which "afforded to their incipient amour full opportunity to develop and mature into her complete dishonor."

In *Kohlhoss* v. *Mobley, supra,* JUDGE SCHMUCKER, ir speaking for the Court, said: "The question whether the plaintiff in an action like this connived at the misconduct of his wife is primarily one of fact for the jury. It may even be said that, as the essence of connivance is consent which, . like malice or good faith constitutes an unseen motive of human conduct, it is especially a question for the jury. But the connivance is not proven as an independent fact. It is usually established as a conclusion from a line of conduct pursued by the husband in relation to his wife's intercourse with and relations to the alleged paramour. If, therefore, the conduct of the husband as established by undisputed evidence or admitted in his own testimony is such that a rational mind could draw no other conclusion therefrom than that he had consented actively or passively to the conduct on the part of his wife and the defendant of which he complains, the question would become one of law for the court which in that event would not only be justified in taking the case from the jury, but it would become its duty to do so."

It could hardly be contended that if the converse of what is said in the concluding paragraph of that quotation appears, it would not likewise be in the province of the court and its duty, if it were requested to do so, to instruct the jury that there was no legally sufficient evidence of consent or conni-

vance. A peculiarity of the fifteenth prayer is that the de-
fendant took what this court said would be for the court and
submitted it to the jury. We were speaking of the duty of
the court if it found what it there stated—not that it was for
the jury to determine whether the evidence was such that a
rational mind could draw no other conclusion, but we do not
see how it could have injured the plaintiff.

It is apparent that Mrs. Culver was of a jealous disposi-
tion, but she knew her husband better than the others who
testified, and as it turned out, it is shown that her suspicions
were not without foundation. Some of the reasons she gave
for suspecting him and Mrs. Murrell of improper conduct
were so peculiar, not to say foolish, that it is not strange that
the plaintiff, who apparently was attached to his wife and
loved her, refused to believe that there was anything wrong—
such things as her husband and Mrs. Murrell eating philo-
penas together in the presence of Mrs. Culver and Mr. Mur-
rell, Mr. Culver taking dancing lessons at the instance of the
plaintiff, and similar things spoken of. She said she watched
Mrs. Murrell following her husband up and down the fence
at the fair at Salisbury in a way we need not repeat. Such a
statement to a man who trusted his wife was calculated to
make him indignant rather than suspicious, especially as he
said he knew that she was simply moving up and down there
to get his two brothers together, as they had not seen each
other since one of them came out of the army.

But there are some things which Mrs. Culver said occurred
several months before the final separation, and which she
told the plaintiff, which were sufficient to go to the jury.
Whether or not they were true was for the jury, and appar-
ently the jury did not believe them, as they found a verdict
for the plaintiff. But as early as April or May, 1920, some
matters were brought to the plaintiff's attention by Mrs.
Culver which were of a serious nature, and on May 5th,
Mrs. Turner, a sister of the defendant, complained to Mrs.
Murrell about her harboring her brother in her home and

causing him to leave his own home, and Mrs. Culver testified that, after the separation on September 15th, the plaintiff told her that his wife had told him what Mrs. Turner said, on the night of the day she spoke to his wife. She also testified that he told her that he knew at the time that her husband had been at a disreputable house kept by a colored man and that his (plaintiff's) wife had taken a taxi and gone out there to him. That, we understand, was in May, 1920, when it was rumored that the defendant had gone off. Several things occurred which subsequent events seem to prove were true. In the spring of 1920 the defendant hired a taxi, told the chauffeur to put the curtains on, went to the plaintiff's house, where he got the plaintiff's wife, and drove about a mile out of town. They got out of the taxi, went into the woods, the defendant taking a blanket out of the taxi which he carried with him. They remained there about twenty minutes and then drove back to town. The plaintiff denies that he knew of this, but it is claimed that, as early as the spring of 1920, improper relations were existing between the defendant and the plaintiff's wife, and that the plaintiff's attention was called to things regarded as at least suspicious. Other people seemed to know of the talk, and we find that the defendant's sister was telling the plaintiff's wife that she was breaking up the home of her brother, and later his brothers took steps to ascertain the facts, and finally they and the defendant's own son went to the plaintiff and urged that something be done to break off the relations between the defendant and the plaintiff's wife.

It is difficult to understand what motive could have induced the plaintiff to consent to, or connive at, such conduct on the part of his wife, and it may be that his trust in her and her influence over him misled him, but we are not to determine whether he was guilty of consenting or conniving, only whether there was legally sufficient evidence to go to the jury, and we are forced to the conclusion that there was. Lord Stowell said, in *Morson* v. *Morson*, 3 Hagg. 87,

quoted with approval in *Kohlhoss* v. *Mobley, supra*: "The first general and simple rule is that, if a man sees what a reasonable man could not see without alarm, if he sees what a reasonable man could not permit, he must be supposed to see and mean the consequences."

Without referring to other facts, we are of the opinion that there was enough in the case to justify the granting of the third and the twelfth prayers. As we have already indicated, there was no *reversible* error in granting the twelfth, even if we had reached a different conclusion as to the legal sufficiency of the evidence, as the verdict was not for the defendant, and hence that prayer did not injure the plaintiff. As the third prayer referred only to the first and second counts, it differed from the twelfth, which concluded with a verdict for the defendant generally, and not merely on any particular count or counts. For reasons given, the judgment must be reversed.

> *Judgment reversed, the appellee to pay the costs above and below, and new trial awarded.*